UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
SECURITIES AND EXCHANGE                )
COMMISSION,                            )
)
        Plaintiff,          )      Civil Action No.
)
   v.                              )
)
BIOCHEMICS, INC., JOHN J. MASIZ,       )      JURY TRIAL DEMANDED
CRAIG MEDOFF and GREGORY S. KRONING,   )
)
      Defendants.          )
)
_____)

## COMPLAINT

       Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants BioChemics, Inc. ("BioChemics"), John J. Masiz ("Masiz"), Craig Medoff

("Medoff") and Gregory S. Kroning ("Kroning," and collectively with Masiz and Medoff, the

"Individual Defendants"):

## SUMMARY

       1.      From 2009 until mid-2012, BioChemics, a biopharmaceutical company based in

Massachusetts, and the Individual Defendants engaged in a fraudulent scheme to sell

BioChemics securities to approximately 70 investors, raising at least $9,000,000.  BioChemics

investors were located in at least 19 different states, including Massachusetts, New Hampshire,

Rhode Island, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Minnesota, Missouri,

North Carolina, New Jersey, New York, Oklahoma, Pennsylvania, South Carolina, Texas, and

Virginia.

2.      At all relevant times, BioChemics specialized in a purported transdermal drug delivery, with side businesses in over-the-counter cosmetic products and veterinary products. BioChemics claimed that its transdermal drug delivery technology delivered a wide variety of existing drug molecules through the skin to a patient's bloodstream.  Though BioChemics marketed and sold some over the counter products for humans, and some non-drug veterinary products, none of BioChemics' pharmaceutical products had been approved by the Food and Drug Administration ("FDA") or any other analogous governmental regulator in another country.

3.      Masiz was the founder, president, CEO, and Chairman of the Board of Directors of BioChemics.  Among other things, Medoff and Kroning were retained by BioChemics as promoters (people paid to find investors for the company).

4.      BioChemics and each of the Individual Defendants (and their agents) made false and misleading statements to investors while selling BioChemics securities, including statements that misled investors about the value of BioChemics securities.  Among other things: (a) BioChemics, Masiz, Kroning and their agents misrepresented to investors in 2011 that BioChemics had ongoing research and development collaborations with certain other pharmaceutical companies when in fact the collaborations with those companies had either never begun or had ended in 2009 or by mid-2010; (b) BioChemics and Masiz misrepresented to investors in early 2010 that the company had two drugs currently under FDA review, when in fact it had no products under any type of FDA review; (c) from 2009-2012, BioChemics and the Individual Defendants made misrepresentations to investors about the progress and results of clinical trials for BioChemics' products; (d) BioChemics and the Individual Defendants misled investors about valuations of BioChemics that were purportedly prepared by reputable independent investment banks.  For example, BioChemics and Masiz misrepresented valuations,

or circulated documents that were not actual valuations, of BioChemics of $500 million in 2007-2008 and up to $2 billion in 2009, and all of the defendants misrepresented these figures to investors as actual and independent valuations of the company; and (e) BioChemics and the Individual Defendants misrepresented Masiz's background and his compensation.  For example, the defendants failed to disclose to investors that Masiz was the subject of a prior Commission securities fraud action that resulted in a final judgment against him in 2004.  The defendants  also told investors that their investments were going to fund BioChemics' operating expenses and clinical trials and that Masiz was not taking a salary at BioChemics, when in fact investor funds were used to pay for personal expenses of Masiz (such as meals, massages, clothing, and sporting goods) and Kroning (such as a leased BMW automobile).  Investor funds were also used to pay Masiz a salary indirectly through BioChemics' subsidiary.

5.    By engaging in the conduct alleged herein:

a.   BioChemics, Masiz, Kroning and Medoff violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder;

b.   Masiz is liable for BioChemics' violations of the Exchange Act as a controlling person of BioChemics under Section 20(a) of the Exchange Act;

c.   Kroning and Medoff aided and abetted BioChemics' and Masiz's violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder;

d.    Kroning and Medoff violated Section 15(a) of the Exchange Act by acting as unregistered broker-dealers; and

    e.    Medoff violated Section 15(b)(6)(B) of the Exchange Act by violating a prior Commission order permanently barring him from associating with any broker, dealer, investment adviser, investment company or municipal securities dealer.

6.    Based on these violations, the Commission seeks: (1) entry of permanent injunctions prohibiting defendants from committing further violations of the relevant provisions of the federal securities laws; (2) entry of permanent injunctions prohibiting specific conduct by Masiz and Medoff related to the violations alleged herein; (3) entry of an order barring Masiz from serving as the officer or director of a public company; (4) disgorgement of defendants' ill-gotten gains, plus pre-judgment interest; and (5) the imposition of civil monetary penalties on defendants due to the egregious nature of their violations.

## JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Sections 20(b) and (d) and 22(a) of the Securities Act [15 U.S.C. §§77t(b), (d); 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u and 78aa].

9.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], and Section 27 of the Exchange Act [15 U.S.C. §78aa] because some of the acts, transactions, or courses of business constituting the alleged violations occurred in the District of Massachusetts, and because defendants have transacted business in

Massachusetts, Masiz is an inhabitant of Massachusetts, and the principal place of business of BioChemics is Massachusetts.

10.     In connection with the conduct alleged in this complaint, defendants directly or indirectly made use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails.

11.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

12.     Unless enjoined, defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

13.     BioChemics is a privately-held Delaware corporation with a principal place of business at 99 Rosewood Dr., Danvers, Massachusetts.  BioChemics was incorporated in 1991.

14.     Masiz is a resident of Topsfield, Massachusetts.  Masiz is the founder of BioChemics, and from its inception through the present, has served as its President, CEO, and Chairman of its Board of Directors.  Masiz is also an attorney admitted to practice in Massachusetts.  In a prior case brought by the Commission in 2004 against him and VASO Active Pharmaceuticals, Inc. ("VASO"), a BioChemics subsidiary, a final judgment was entered against Masiz that permanently enjoined him from violating the antifraud provisions of the federal securities laws, and barred him from serving as an officer or director of a public company for five years.

15.     Medoff is a resident of New York City, New York.  In 2009, Medoff was the managing director of Mercury Capital Group, LLC ("Mercury"), an entity which was formed

specifically to service BioChemics and through which he provided a variety of services to BioChemics. Medoff also served, for several months in 2009, as the interim Director of Finance for BioChemics. During 2009, Medoff also solicited investments in BioChemics from a number of potential investors. In a prior case brought by the Commission in 1993, which alleged that Medoff sold a company's unregistered stock to the public through the use of materially false and misleading documents, a final judgment was entered against Medoff that permanently enjoined him from violating the antifraud provisions of the federal securities laws. In January 1995, the Commission issued an Order that permanently barred Medoff from association with any broker, dealer, investment adviser, investment company or municipal securities dealer. In 1995, Medoff also pled guilty to two counts of conspiracy to commit securities fraud in a criminal case.

16.     Kroning is a resident of Norwood, New Jersey. Kroning works for a consulting group through which he and others provided a variety of services to BioChemics. From at least 2009 until at least 2011, Kroning actively solicited investments in BioChemics from a number of potential investors. Though Kroning was, at one time, associated with a registered broker-dealer, he was barred by the New York Stock Exchange from the industry for one year and has not sought to resume his affiliation with a registered broker-dealer. Kroning previously held Series 7, 8 and 63 securities licenses.

## FACTUAL ALLEGATIONS

### A.     Background Concerning BioChemics

17.     At all relevant times, BioChemics purported to possess "the world's best and most effective transdermal drug delivery technology, intellectual property and patents" which "can be applied to the vast majority of drugs in the Pharmacopeia, over 1,000 drugs" and for which,

"BioChemics literally does not have any real competition with its transdermal drug delivery capabilities."

18.     In 2003, BioChemics spun out its subsidiary, VASO, as a publicly-traded company through an initial public offering of VASO's securities.  Masiz served as the President, Chairman of the Board, and CEO of VASO in addition to maintaining his duties at BioChemics. In August 2004, the Commission sued Masiz and VASO for securities fraud arising from false and misleading statements in a number of VASO's securities filings and on its website about the need for, or status of, FDA approval of certain of its over-the-counter products.  Without admitting or denying the allegations of the Complaint, Masiz settled the Commission's charges, agreed to permanent injunctions against further violations of the relevant antifraud provisions of the federal securities laws, was barred from serving as an officer or director of a public company for five years, and agreed to pay an $80,000 civil penalty.

19.     Though Masiz stepped down from his roles as an officer and director of VASO in 2004, he remained a strategic consultant to the company, and earned the same salary in his new position.  In March 2010, VASO filed for Chapter 11 bankruptcy protection.  After VASO's bankruptcy, Masiz continued to be involved in negotiating with potential merger candidates to finance VASO's potential plan of reorganization.

**B.     BioChemics' Securities and Its Solicitation of Investors**

20.     BioChemics has issued at least five classes of securities to its investors:  Series A preferred stock and notes; Series B notes (held by Masiz, his family members, and entities owned or controlled by them); Series C preferred stock; Series E convertible preferred stock and bridge financing debentures; and common stock.

21.     Beginning in 2009, BioChemics began offering and selling "8% Bridge Financing Convertible Debentures" (the "Bridge Debentures") which were convertible into Series E preferred stock.  BioChemics continued to sell these Bridge Debentures until late 2010. BioChemics raised approximately $5 million from sales of bridge debentures to investors during this time.

22.     Beginning in approximately June 2009, BioChemics began offering and selling "8% Senior Convertible Preferred" Series E stock ("Series E Stock").  BioChemics continued to sell Series E stock through at least mid-2012.  BioChemics raised approximately $4 million from sales of Series E Stock to investors during this time.  Masiz solicited investors through personal meetings and telephone calls and sent written solicitation materials to potential investors.  He also led sales presentations in "road show" meetings with potential investors that were organized by Kroning and other promoters of BioChemics' securities affiliated with Kroning's consulting firm.

23.     Masiz also authorized Kroning and other promoters to solicit investors to purchase Bridge Debentures and/or Series E Stock.  The promoters frequently provided potential investors with written BioChemics sales materials that had been created or approved by Masiz, and that Masiz had given to the promoters, including Kroning and Medoff, for further distribution to potential investors.  Kroning and his associates and Medoff also recruited promoters to solicit investors for BioChemics.

24.     From 2009 through mid-2012, BioChemics paid more than $1,000,000 in sales commissions on BioChemics investments made by investors that Kroning and other promoters affiliated with Kroning's consulting firm had solicited.  In most cases, the commissions were calculated as 10 percent of an investment made by an investor.

25.     Since at least 2009, Kroning personally solicited BioChemics investments from at least 100 potential investors.  Kroning communicated frequently with both prospective and existing BioChemics investors, encouraged them to invest, and sent them written information about BioChemics that he obtained from Masiz, as well as some materials he was involved in creating.  Kroning also caused investors to sign the subscription documents through which BioChemics' investors purchased its securities.  In addition, Kroning coordinated and directed the activities of other promoters.

26.     From 2009 through 2011, BioChemics paid Kroning over $400,000: (a) approximately $117,500 in transaction–based compensation indirectly paid via BioChemics payments to Kroning's consulting firm; (b)  approximately $228,350 in undocumented "loans" (with no agreed-upon repayment terms); and (c) approximately $55,000 via payments made directly to Kroning's creditors (including for a leased BMW automobile).

27.     During the first half of 2009, Medoff solicited investments in BioChemics from at least 50 prospective investors.  Medoff sent many of these prospective investors multiple email messages encouraging them to invest in BioChemics securities, and provided written BioChemics materials in an effort to obtain their investments.

28.     Medoff's solicitation efforts resulted in several investments in BioChemics securities.  For his efforts, BioChemics paid Medoff more than $10,000 in commissions.

C. **Defendants Misled BioChemics Investors About the Company's Research and Development Programs and Collaborations, FDA Review of its Products, and Status of the Company's Clinical Trials**

### 1. Misleading Information about Collaborations

29.     During the period from at least 2010 to 2011, BioChemics, Masiz, and Kroning (and their agents) misrepresented to many of BioChemics' investors and prospective investors the status of a number of its research collaborations with other pharmaceutical companies.

30.     For example, in 2010 and 2011, BioChemics published a multiple-page overview entitled Executive Summary ("Executive Summary") that touted its research collaborations with Cynosure, Inc. ("Cynosure"), Unilever United States, Inc. ("Unilever"), and Nanobac Pharmaceuticals, Inc. ("Nanobac"), after those relationships were defunct. Masiz was ultimately responsible for the content of the Executive Summary.

31.     Masiz gave the misleading Executive Summary to potential investors. Masiz or BioChemics employees acting at his direction also gave the Executive Summary to Kroning and other BioChemics promoters, who then sent the misleading Executive Summary to investors and potential investors.

32.     In particular, versions of the Executive Summary sent to potential BioChemics investors on at least October 18 and 29, 2010, April 7, 2011, June 9, 2011, August 23, 2011, and November 4, 2011, each stated, "Recent (past 12 months) milestones include: . . . Research and Commercial collaboration agreement with Cynosure Inc. (NYSE: CYNO) to utilize BioChemics' patented VALE® technology in conjunction with light based aesthetic treatments."

33.     The Executive Summary's statements about BioChemics' relationship with Cynosure were materially misleading. Though the Executive Summary claimed in late 2011 that the agreement between BioChemics and Cynosure was a milestone from the "last 12 months,"

the parties' agreement had actually terminated according to its provisions in approximately August 2009.  Cynosure informed BioChemics by October 2009 that the project would not be continued.  BioChemics acknowledged in internal documents from December 2009 that the Cynosure project "has been terminated."  The Executive Summary falsely indicated that the relationship with Cynosure was ongoing, and failed to disclose the material fact that it had been terminated without producing positive results.

34.     Similarly, versions of the Executive Summary sent to potential BioChemics investors on at least October 18 and 29, 2010, April 7, 2011, June 9, 2011, August 23, 2011, and November 4, 2011, each stated, "Recent (past 12 months) milestones include: . . . Signed a co-development relationship with Unilever for the topical delivery of an amino acid which would be a product line extension for Vaseline Skin care, one of Unilever's branded product lines."

35.     The Executive Summary's statements about BioChemics' relationship with Unilever were materially misleading.  Although in 2009 the parties had signed an agreement for Unilever to test a BioChemics product on humans, Unilever stopped the test abruptly in November 2009, after the BioChemics product caused adverse reactions on the patients' skin.  Unilever never approved any further testing of BioChemics products and there was no contact between BioChemics and Unilever about the project after June 2010.  The Executive Summary falsely indicated that the relationship with Unilever was ongoing, and failed to disclose the material fact that the testing of BioChemics' product had been halted because of the adverse reaction it caused.

36.     In May 2010, Masiz signed a Spring Newsletter addressed to BioChemics "Friends and Investors" that contained additional misrepresentations about BioChemics' relationship with Unilever.  Between late May 2010 and late October 2010, Masiz and Kroning

sent, and directed others to send, this newsletter to prospective and current BioChemics

investors.  In particular, the Spring Newsletter stated that the product BioChemics had created as

a "product line extension for Unilever's Vaseline Intensive Care and Ponds skin care brands"

was "clinically tested and over exceeded its performance targets."  The Spring Newsletter was

false because the clinical test of BioChemics' product had been halted because it produced an

adverse reaction.  At the time he signed the Spring Newsletter, Masiz knew, or was reckless in

not knowing, why Unilever had halted its testing of BioChemics' product.

37.     The same versions of the Executive Summary sent to potential BioChemics

investors on at least October 18 and 29, 2010, April 7, 2011, June 9, 2011, August 23, 2011, and

November 4, 2011, also stated, "Recent (past 12 months) milestones include: . . . Research

collaboration agreement with Nanobac Pharmaceuticals Inc. to utilize its leading patented drug

delivery technology (VALE®) for the transdermal (topical) delivery of Nanobac compounds for

the treatment of prostatitis."

38.     The Executive Summary's statements about BioChemics' relationship with

Nanobac were materially misleading.  Although the Executive Summary in late 2011 claimed

that the agreement between BioChemics and Nanobac was a milestone from the "last 12

months," the only contract between BioChemics and Nanobac was signed in March 2008 and did

not result in any substantive relationship.

39.     Masiz controlled the content of the Executive Summary and knew that the

statements it contained concerning the status of BioChemics' collaborations with Cynosure,

Unilever and Nanobac were materially misleading.  Kroning sent the Executive Summary to

investors and potential investors throughout 2010 and 2011, although he knew, or was reckless in

not knowing, that BioChemics' relationships with Cynosure, Unilever and Nanobac were

inactive.

**2.     Misleading Information About BioChemics'
       Clinical Trials and FDA Review**

40.     During the period from at least 2009 to 2011, BioChemics and the Individual

Defendants misrepresented to many of its investors and prospective investors the status of its

clinical trials for the drugs in its pipeline.

41.     For example, in 2010 and 2011, BioChemics published a single-page document

titled Executive Summary and containing "Quick Facts" ("Single Page Executive Summary")

that purported to provide an overview about BioChemics, the financing it was seeking, its overall

strategy and the status of its products and research and development programs.  Masiz

participated in drafting and updating the content of the Single Page Executive Summary, and he

sent it to Kroning and other BioChemics promoters with the understanding that it would be

distributed to prospective investors.  Masiz and Kroning knew, or were reckless in not knowing,

that the Single Page Executive Summary contained several false and misleading statements.

42.     Masiz, Kroning, and several BioChemics' promoters affiliated with Kroning sent

the misleading Single Page Executive Summary to investors and potential investors on a number

of occasions throughout 2010 and 2011, including, March 28, 2010, March 29, 2010, May 5,

2010, June 2, 2010, September 6, 2011, and November 4, 2011.  The Single Page Executive

Summary stated, "Research and Development:  Clinical trials underway in Switzerland for BC-

IBU-1 (ibuprofen) BC-DN-1 (diabetic neuropathy), BC-RD-02 (Raynaud's Disease), BC-BS-03

(Pressure Ulcers) and BC-CN-04 (Chemo Therapy Related Neuropathy)."  The document also

stated, "Phase 2 trial using ibuprofen as a first line therapy for osteoarthritis is complete –

awaiting results.  Phase 2 trial on diabetic neuropathy product is about to begin."  Under its list

of "Products: Current:" the one-page Executive Summary also included "BC-OM-01 (pediatric

ear infections)" and under the heading "Target Market Size:" listed "Pediatric Ear Infections - $3

Billion."

43.     These statements were materially misleading in several respects.  First,

BioChemics has never conducted clinical trials in Switzerland (or elsewhere) for its Raynaud's

Disease, pressure ulcers or chemotherapy related neuropathy drugs.  Second, BioChemics is not

developing a product for pediatric ear infections.  Third, as of the dates that the Single Page

Executive Summary was sent to investors or potential investors, a clinical trial of BioChemics'

diabetic neuropathy drug was neither "underway" nor "about to begin."  As of May 2012, the

clinical trial for BioChemics' diabetic neuropathy drug had not yet begun even though the

company had, by then, purportedly taken some preparatory steps towards that trial.

44.     Similar misleading statements about the status of BioChemics' clinical trials were

included in other solicitations sent to investors and prospective investors.  For example, in a

number of email messages sent to prospective investors in 2009, including on January 31,

February 16, March 13, and March 25, Medoff stated that BioChemics had "two drugs in Phase

II clinicals."  At the time Medoff sent these statements to prospective investors, no BioChemics

drugs were in phase two clinical trials.  When he made these statements to investors, Medoff did

not know whether they were true and took no steps to learn whether they were true.  Masiz knew

that Medoff was sending these misleading email messages to prospective investors because

Medoff often copied Masiz on the messages he sent.

45.     Masiz also sent email solicitations to prospective investors that contained the

same misleading statements.  On several dates in early 2009, including February 19 and March 2,

Masiz wrote: "They [BioChemics] have two drugs in Phase II clinicals and three drugs in Phase

I."  At the time, no BioChemics drugs were in phase two clinical trials and Masiz knew, or was reckless in not knowing, that the emails were misleading.

46.     Kroning also sent at least five emails to prospective investors on June 25, 2010, July 26, 2010, August 25, 2010, August 26, 2010, and October 25, 2010 that attached the BioChemics May 2010 Spring Newsletter asserting that the phase two trial for BioChemics' diabetic neuropathy drug was "underway" and discussed an additional study "which will compliment [sic] our trials to be conducted in Switzerland."  Kroning knew, or was reckless in not knowing, at the time this email was sent, that BioChemics had not yet begun a phase two clinical trial for its diabetic neuropathy drug.  Similarly, on November 15, 2011, Kroning sent an email to a prospective investor stating:  "With the successful completion of our Phase II clinical trials for topical Ibuprofen and the initiation of the company's Phase II clinical trials for a treatment of diabetic peripheral neuropathy we are recommending that the company engages a PR firm."  Kroning knew, or was reckless in not knowing, at the time this email was sent that BioChemics had not yet begun a phase two clinical trial for its diabetic neuropathy drug.

47.     In early 2010, BioChemics also misrepresented to many prospective investors the status of FDA review of its products.

48.     In February 2010, based on information he obtained from BioChemics, a securities professional prepared an email solicitation to send to prospective BioChemics investors.  The professional sought and obtained Masiz's approval for the final text of the message that was sent to prospective investors.  After obtaining Masiz's written authorization to send the message, the professional sent the solicitation to between 50 and 100 prospective investors in February and March 2010.

49. This solicitation contained the following statements: BioChemics "currently has 6 drugs under development, 2 of which are in Phase II trials that are expected to be completed within six months;" BioChemics is raising money "to complete Phase II clinical trials for the Company's two lead drugs: BC-IBU-1 (prescription ibuprofen) and BC-DN-1 (a diabetic neuropathy treatment);" and "Independent Valuation by Mercury Capital** $1.2B based solely on the first 2 drugs currently under FDA review."

50. The statements contained in this solicitation were materially misleading in several respects. At the time the statements were made, BioChemics did not have "2 drugs currently under FDA review." It had no drugs under any type of FDA review. In fact, BioChemics did not seek to begin the FDA review process for the first of its products, ibuprofen, until the spring of 2012. In addition, at the time the statements were made, BioChemics' diabetic neuropathy drug was not "in" a phase two clinical trial and there was no reasonable expectation that the diabetic neuropathy trial would be "completed within six months."

51. Masiz knew or was reckless in not knowing that the securities professional's solicitation contained false and misleading statements about the progress of BioChemics' clinical trials and the status of FDA review of BioChemics' products.

### 3.     Misleading Information Concerning BioChemics' Ibuprofen Clinical Trial

52. BioChemics received preliminary results of the Phase II clinical trial of its topical ibuprofen cream product in October 2011 and announced those results in a press release dated December 7, 2011. BioChemics received a final clinical trial report in March 2012. The clinical trial measured the difference in pain relief between BioChemics' ibuprofen drug and a placebo on patients who had osteoarthritis in one knee, for a period of fourteen days for each patient. Patients' pain was measured on study days 8 and 15 (treatment days 7 and 14).

53.     The clinical trial measured pain relief in six ways: (1) pain while walking using the visual analog scale ("VAS") (a method of measuring pain by pointing on a continuous line ranging from "no pain" at one end to "extreme pain" at the other end); (2) pain at rest using the VAS; (3) pain while standing using the VAS; (4) pain using the Western Ontario and McMaster Universities Arthritis Index ("WOMAC") (a standardized questionnaire used by health professionals to evaluate patients' pain); (5) global impression of change in pain scales; and (6) patient's use of rescue medication.

54.     The study report, and BioChemics' documents written before the study results were available, made it clear that the primary efficacy variable or endpoint that BioChemics chose to test was pain while walking using the VAS, measured at study day 15.  For that primary endpoint, however, the clinical results were not statistically significant when the BioChemics' ibuprofen drug was compared to the placebo.

55.     In fact, BioChemics' ibuprofen drug performed better than the placebo in a statistically significant way for only one of the variables tested:  pain using the WOMAC (the ibuprofen drug's results were better than the placebo in a statistically significant way for two of the four sub-parts of the WOMAC).

56.     When it publicized the results of the ibuprofen clinical trial, however, BioChemics made no mention of its mixed results.  For example, its December 7, 2011 press release, which was posted on its public website and emailed to prospective investors, contained materially misleading statements and omissions.  First, BioChemics touted the one WOMAC variable for which the results were statistically significant (and even included the precise measure of its statistical significance) but did not mention all of the other variables, including the study's primary endpoint, for which the results were statistically insignificant when compared to

the placebo.  Second, the press release implied that BioChemics' ibuprofen drug produced a statistically significant "greater reduction in pain from the baseline than the placebo on the VAS pain scale."  The press release, however, omitted the material fact that the stated difference between the ibuprofen drug and the placebo was not statistically significant (and also omitted that the results for none of the three measures of pain using the VAS were statistically significant).

57.     Similarly misleading information was contained in an Autumn Newsletter dated November 1, 2011, and addressed to "Friends and Investors" that was edited by Kroning and signed by Masiz.  In particular, the Autumn Newsletter falsely implied that on the VAS, the ibuprofen cream produced a statistically significant "greater reduction in pain than placebo!" The newsletter did not disclose, however, that the stated difference between the ibuprofen drug and the placebo was not statistically significant, and did not disclose that the results for the other two variables measured by the VAS were statistically insignificant compared to the placebo. The Autumn Newsletter also falsely stated that "[t]he primary endpoint of the Phase 2 trial on BC-IB-01 was diminishment of osteo arthritis pain while at rest."

58.     BioChemics published the December 7, 2011 press release on its website, and Masiz, Kroning and other BioChemics promoters acting under their supervision or with their authorization sent copies of the press release, the Autumn Newsletter, and other emails containing similar misleading statements, to current and prospective BioChemics investors throughout the time period from November 2, 2011 through mid-2012.

59.     Neither the press release, the Autumn Newsletter, nor BioChemics' other solicitations containing information about the ibuprofen clinical trial disclosed an important fact about the composition of the ibuprofen product and the placebo:  the ibuprofen product contained

two well-known topical pain relievers (menthol and eucalyptol) in addition to the ibuprofen

component.  The placebo did not contain either menthol or eucalyptol.  Any pain relief resulting

from the use of BioChemics' ibuprofen product could have resulted from the topical pain

relievers it included, rather than demonstrating that BioChemics' transdermal technology was

able effectively to deliver ibuprofen through the skin into the patients' bloodstream.

60.     Masiz and others at BioChemics knew, before the ibuprofen clinical trial began,

that consultants retained to advise BioChemics on the clinical trial were concerned about the

disparity caused by including the additional topical pain relievers in the ibuprofen composition

but not the placebo, but BioChemics did not change the ibuprofen composition.

61.     BioChemics and Masiz did not disclose the differences between the active

formulation and the placebo to the potential investors to whom it described the study results.

BioChemics' failure to disclose the difference between the ibuprofen drug's composition and the

placebo was a material omission that made its other statements about the ibuprofen drug's

effectiveness misleading in context.  Its failure to disclose the difference between the ibuprofen

composition and the placebo was also a material omission because investors were given the

misleading impression that the study showed the efficacy of BioChemics' technology in moving

drugs, such as ibuprofen, into the bloodstream (and BioChemics used this misleading impression

to solicit potential collaboration partners for further development of the product, and whose

solicitation BioChemics was promoting to its investors as a key component of its success).

**D.      Defendants Misled BioChemics Investors About the Company's Value**

**1.      Misleading Information About the Purported Jefferies Valuation**

62.      From mid-2007 to mid-2008, BioChemics had preliminary discussions with an investment bank, Jefferies & Company, Inc. ("Jefferies") concerning the potential for a BioChemics initial public offering ("IPO").

63.      BioChemics and Jefferies never signed an engagement letter for an IPO, and BioChemics never paid Jefferies for the preliminary discussions.

64.      One component of the preliminary discussions between BioChemics and Jefferies was the potential value of BioChemics.  In late 2007, Jefferies employees contacted Masiz to schedule a call to "discuss valuation issues/considerations."  To "assist in the dialogue" for that call and to provide a framework for discussing Jefferies' preliminary thoughts about how to value BioChemics, a Jefferies employee sent Masiz an email on December 3, 2007 with the subject line "Preliminary IPO Discussion Materials" and attached a document entitled "BioChemics IPO Discussion Materials 3.12.07 v1.ppt" (the "Jefferies Document").

65.      Both the Jefferies Document itself and the context surrounding its transmission to Masiz made it clear that the Jefferies Document was not Jefferies' formal opinion of the value of BioChemics.  The cover page of the Jefferies Document stated that it contained "Materials for Preliminary Valuation Discussion," it contained a list of "Further Due Diligence" subject areas that required further research, and it did not contain any of the typical qualifications or disclaimers that an actual valuation would contain.  Moreover, much of the information contained in the Jefferies Document was based on false and exaggerated financial and other data and information provided by Masiz and others at BioChemics.

66.     The Jefferies Document was not a formal opinion of value, and was inappropriate to send to third parties such as investors or prospective investors.  It was intended solely to facilitate internal discussions between Jefferies and BioChemics employees and was meant to be kept confidential.  Jefferies never authorized Masiz or others to provide the document to third parties.

67.     At some point after Masiz received the document and before it was sent to prospective investors, as described in the following paragraphs, its name was changed, from "BioChemics IPO Discussion Materials 3.12.07 v1.ppt" to "Jefferies Valuation Presentation" and "Jefferies-BioChemics US IPO Valuation ppt" (collectively the "Altered Jefferies Document").

68.     Despite the fact that the Altered Jefferies Document was not an actual opinion of value, Masiz, Medoff and Kroning sent it to prospective and actual BioChemics investors and described it as such.  In most instances, the Altered Jefferies Document was sent under its new altered name, and in some instances, a page relating to the need for further due diligence, and pages relating to the potential valuation of BioChemics were it a public company in the United Kingdom, were omitted.

69.     Masiz sent or described the Altered Jefferies Document, including copies that in some instances omitted the further due diligence page, to prospective BioChemics investors on numerous occasions from 2008 through 2011.   For example:

      a.   In an April 17, 2008 email to a prospective investor, which was copied to, and followed up on an email message sent to the same investor by, Kroning, Masiz stated that "probably the best current estimate of value is the valuation of the company . . . put together by Jefferies . . . I have attached that as well . . . ."

b. In a February 5, 2009 email to a prospective finder or investor, Masiz stated "[e]xtensive due diligence has been performed by Jefferies in preparation for an IPO during 2008 with a pre-money valuation of $500 million – the deal was pulled during 2008 due to market conditions)."

c. In a February 19, 2009 email to a prospective investor, Masiz stated "[e]xtensive due diligence has been performed by Jefferies in preparation for an IPO during 2008 with a pre-money valuation of $500 million (I can provide the Jefferies Equity Valuation Analysis - the deal was pulled during 2008 due to market conditions)."

d. In a March 2, 2009 email to a prospective investor, Masiz stated "I would like you to review the Equity Valuation on BioChemics from Jefferies . . ." and "[e]xtensive due diligence has been performed by Jefferies in preparation for an IPO during 2008 with a pre-money valuation of $500 million (see Jefferies Equity Valuation Analysis attached – the deal was pulled during 2008 due to market conditions)."

e. Masiz sent an email to a prospective investor on April 2, 2009 that attached both the Jefferies Document and the Executive Summary, which stated that "[o]n December 3, 2007 Jefferies Group Inc. performed an Equity Valuation Analysis on BioChemics, Inc. and utilizing a discounted cash flow ("DCF") model determined that the Company is worth $500 million.  The equity valuation by Jefferies only included one drug under development (osteoarthritis) for one market (the U.S.) and arbitrarily eliminated the Company's other major drug under development (diabetic neuropathy) and eliminated one market (Europe).

Utilizing the Jefferies Equity Valuation from over one year ago, BioChemics true

theoretical valuation is at least $2 billion just based upon the two drugs in

development . . . ."

f.   In a May 3, 2010 email to a prospective investor, Masiz attached the Altered

Jefferies Document and described it as "a Valuation Report from Jefferies" which

was a "valuation" "done in anticipation of a public offering in the Fall of 2008

and was pulled due to market conditions."

g.   In an October 18, 2010 email to a prospective investor, Masiz attached the

Altered Jefferies Document and described it as a "valuation report" done by

Jefferies in 2007.  He also described the numbers in the document as the

"Jefferies 2007 value" of BioChemics.

h.   On January 12, 2011, Masiz sent the Altered Jefferies Document, along with

numerous other documents, to a prospective investor, describing the documents as

a "Valuation Grouping."

70.   The statements by Masiz described in paragraph 69 were materially misleading

for several reasons.  First, as discussed above, the Jefferies Document was not an equity

valuation of BioChemics.  It did not "value" BioChemics at $500 million.  It was prepared for

preliminary discussions only, not intended to be shared with third parties, and was intended to be

kept confidential.  Second, the BioChemics IPO was not pulled during 2008 as a result of market

conditions.  In fact, there was no "deal" to pull, as Jefferies' and BioChemics' discussions never

progressed to the point where there was a "deal" and certain preconditions to an IPO, including

certain research and development events, were never reached.  Third, the Jefferies Document did

not eliminate revenues from BioChemics' contemplated diabetic neuropathy drug.  It thus did not

support a valuation of BioChemics at $2 billion. Masiz knew or was reckless in not knowing that these statements were materially misleading.

71.     Medoff also sent or described the Jefferies Document to prospective BioChemics investors on numerous occasions during 2009, including in email messages to prospective investors on January 31, 2009, February 16 and 17, 2009, March 13 and 25, 2009, and April 1, 2009. Some of these email messages were copied to Masiz.

72.     The email messages sent by Medoff contained many of the same misleading statements that were contained in those sent by Masiz, including the statements that the Jefferies Document was an "equity valuation" finding that BioChemics was worth "$500 million," that Jefferies had performed "extensive due diligence" on BioChemics, that the "deal was pulled during 2008 due to market conditions," and that BioChemics' "conservative" valuation was actually $2 billion based on the Jefferies methodology.

73.     At the time when he sent or described the Jefferies Document to investors, Medoff knew, or was reckless in not knowing, that his description of the document was false and misleading because Jefferies had not performed due diligence on BioChemics.

74.     Kroning also sent (directly or indirectly) or described the Altered Jefferies Document (including, in at least one instance, versions without the further due diligence page) to prospective BioChemics investors, including in email messages sent on November 6, 2009, May 12, 2010 and March 28, 2011. During this time, Kroning was aware that there were two versions of the Altered Jefferies Document (one without the due diligence page).

75.     Masiz and Kroning's use of the Jefferies Document and/or the Altered Jefferies Document with prospective or actual investors in late 2010 and 2011 was materially misleading for an additional reason. When they used the Document during that time, Masiz and Kroning

knew, or were reckless in not knowing, that the 2009 and 2010 BioChemics revenue projections

on which the Jefferies Document were based had not come true.  Specifically, while the Jefferies

Document assumed BioChemics earned 2009 risk-adjusted revenues of $36.7 million and 2010

risk-adjusted revenues of $117.5 million, BioChemics' actual revenues for both of those years

were well under $300,000, and both Masiz and Kroning knew the actual revenue figures.

Nonetheless, Masiz and Kroning continued to send the Jefferies Document or the Altered

Jefferies Document to actual and potential investors as a reliable opinion of value without

explaining that the entire premise of the numbers in the Document was unfounded.

### 2.    Misleading Information About the Mercury Valuations

76.    In early 2009, Masiz hired Medoff and his company, Mercury, to create a

purportedly "independent" valuation of BioChemics.

77.    The first valuation purportedly prepared by Mercury asserted that BioChemics

was "conservatively" worth $2 billion.  This valuation was contained in a March 10, 2009 letter

to Masiz on Mercury letterhead (the "$2 billion Valuation Letter").

78.    The $2 billion valuation was derived by quadrupling the purported Jefferies $500

million valuation to account for the fact that the Jefferies analysis was allegedly based on only

one of BioChemics' two lead drugs (ibuprofen but not diabetic neuropathy) and only one of the

two planned markets for those two drugs (the United States but not Europe).  As discussed

above, this characterization of the Jefferies Document is misleading because the Jefferies

Document already included BioChemics' estimates of its revenues for both the ibuprofen and

diabetic neuropathy drugs, and furthermore, the Jefferies Document was not an actual opinion of

value.

79.     Masiz sent the $2 billion Valuation Letter to at least one existing BioChemics investor (who was also a lender), as a justification for why that investor should accept a small number of additional BioChemics securities as compensation for its agreement to extend the due date of its loans to BioChemics.

80.     Though the $2 billion Valuation Letter purported to be the independent opinion of Mercury, Masiz himself--not Medoff or Mercury--came up with the idea to multiply the purported Jefferies valuation by four to arrive at a $2 billion valuation.  Masiz also drafted material portions of the $2 billion Valuation Letter.  The letter was misleading because it did not disclose Masiz's significant personal involvement in its creation.

81.     The $2 billion Valuation Letter was also materially misleading because it purported to be an independent valuation prepared by Mercury, but did not disclose Mercury's financial interest in BioChemics' investment offerings.  In particular, the letter did not disclose that some of Mercury's compensation was tied directly to the value of the investments it brought into BioChemics, or that Medoff (then the Managing Director of Mercury) was also then being paid as the Interim Director of Finance of BioChemics.

82.     At the time they prepared the $2 billion Valuation Letter and then sent it to an existing BioChemics investor, Masiz and Medoff knew that the company was not worth $2 billion.

83.     On or about April 8, 2009, one month after it issued the $2 billion Valuation Letter, Mercury issued a second opinion of value for BioChemics--this time valuing the company at $1.2 billion (the "$1.2 billion Mercury Valuation") as of June 30, 2009.

84.      Despite the $1.2 billion Mercury Valuation claim that it was an "independent opinion of value" (similar to the $2 billion Valuation Letter), and promoted to prospective and

existing investors as such, it was actually drafted by Medoff at the direction of Masiz and other

BioChemics employees.  In fact, Masiz set the $1.2 billion valuation figure, instructed Medoff to

produce a report containing that valuation, and provided a purported rationale for the $1.2 billion

figure.  Masiz reviewed and commented on several drafts of the $1.2 Mercury Valuation, and

Medoff revised it based on Masiz's review.

85.     Masiz, Medoff and Kroning, as well as other BioChemics promoters, sent the $1.2

billion Mercury Valuation to many prospective and actual BioChemics investors during the time

period from the spring of 2009 through 2011 and misleadingly described it as an independent

valuation.

86.     Kroning sent the $1.2 billion Mercury Valuation to prospective BioChemics

investors in 2009, despite his knowledge that BioChemics internally valued itself at $200 million

in 2009.  Kroning's use and promotion of the $1.2 billion Mercury Valuation without informing

investors about BioChemics' internal valuation was materially misleading.

87.     The $1.2 billion Mercury Valuation was premised on BioChemics earning $170

million in upfront and milestone payments from joint venture and collaboration partners in 2010.

These payments were premised on the negotiation of contracts that, in turn, depended on the

completion of certain clinical trial phases in 2009 and 2010 that, in turn, depended upon

BioChemics' receipt of $80 million in financing by June 30, 2009.  At the time the $1.2 billion

Mercury Valuation was issued, BioChemics had never received upfront or milestone payments

from joint venture or collaboration partners anywhere near the scale of the multiple $10 million-

plus payments that the valuation assumed.

88.     By mid-2010, at the latest, BioChemics, Masiz and Kroning knew that none of the

factual assumptions underlying the $1.2 billion Mercury Valuation had come to pass.  In

particular, BioChemics, Masiz, and Kroning knew that: (1) BioChemics did not raise $80 million in financing between April and June 2009; (2) BioChemics did not begin or complete any clinical trials in 2009 or 2010; (3) BioChemics did not negotiate any joint venture or collaboration contracts that provided for upfront or milestone payments in 2009 or 2010; and (4) BioChemics would not, and did not, achieve anywhere near $170 million in revenue for 2010.

89.     Despite BioChemics' failure to achieve any of the preconditions on which the $1.2 billion Mercury Valuation was based, Masiz, Kroning and other BioChemics promoters acting at their direction or with their authorization, continued to send the $1.2 billion Mercury Valuation to investors and to represent that it was a reliable estimate of BioChemics' value after mid-2010, including October 14, 2010, October 17, 2010, March 25, 2011, March 28, 2011, and February 17, 2012.  Kroning (through another promoter) forwarded to an investor a "Statement of Account" in August 2011, which valued the investor's holdings based on the Mercury Valuation (and accordingly valued a $100,000 investment at $760,665).  Masiz continued using the Mercury valuation to value warrants (rights to purchase securities at a specific price within a certain time frame) in communications to investors at least as late as January 2012.  Masiz and Kroning's continued use of the $1.2 billion Mercury valuation, without disclosing to investors that many of the underlying assumptions on which it was based had not been borne out, was thus materially misleading.

90.     In addition, in June 2011 Kroning directed another promoter to create (and Kroning then circulated to prospective investors) in June through September 2011 a chart titled "Economic and Financial Valuation" using the Jefferies document and Mercury valuations as data points, which gave the impression (based on those valuations) that BioChemics' value was increasing over time.  Kroning also drafted and circulated in June 2011 to at least three potential

investors, and circulated to one investor in September 2011, a document describing "BioChemics Milestones" which listed the purported Mercury and Jefferies valuations even though Kroning knew, or was reckless in not knowing, that the revenue projections underlying those milestones had not come close to being met.

91.     During the time that he used the $1.2 billion Mercury Valuation with investors, and touted the involvement of Mercury in its preparation, Kroning knew, or was reckless in not knowing, that Masiz had directed and participated in drafting the valuation and that Mercury was not independent.

> **E.      Misleading Information and Material Omissions About Other Aspects of BioChemics' Business**

92.     In addition to creating and distributing misleading information about the status of BioChemics' scientific endeavors, and the value of its securities, defendants also created, distributed, and promoted other misleading information about BioChemics' business.

93.     For example, BioChemics, Medoff, Kroning, and their agents solicited investments in BioChemics based in part on Masiz's allegedly strong leadership and business acumen, including his prior purported success in raising money for, and conducting an initial public offering of, VASO.  One such statement claimed that Masiz "has an excellent 11 year track record on wall street."

94.     Medoff and Kroning did not, however, tell most investors that: 1) Masiz had been a defendant in a previous securities fraud action brought against him by the Commission that resulted in a judgment against him in 2004 or that 2) Masiz had been previously barred from serving as an officer or a director of a public company for five years.  Kroning did not tell investors that VASO had filed for bankruptcy.  Kroning claimed that he only disclosed Masiz's regulatory history if an investor asked him specifically about it.  Given Medoff's and Kroning's

promotion of Masiz' business skill, these omissions rendered their statements materially misleading.

95.     Although investors were told that their investments were to go to BioChemics' operating expenses and to fund clinical trials, BioChemics, Masiz and Kroning omitted to tell investors that:

(a)     BioChemics paid Kroning, in addition to the transaction-based compensation described above, approximately $228,350 in undocumented "loans" (with no agreed-upon repayment terms) and approximately $55,000 paid directly to Kroning's creditors (including a leased BMW automobile);

(b)     BioChemics paid for personal expenses for Masiz, including meals, massages, clothes and sporting goods, for which it was not reimbursed.

96.     Masiz, Medoff, Kroning, and their agents represented to investors that Masiz had not taken a salary at BioChemics.  This statement was materially misleading because BioChemics paid Masiz a salary by advancing funds to its subsidiary, VASO, which were used to pay Masiz's salary (purportedly from VASO).  For example, from 2008 through 2010, BioChemics transferred over $177,000 to Masiz through VASO.  The funds BioChemics transferred to VASO were not subject to any written agreement between BioChemics and VASO, and did not bear interest.  Masiz decided when to transfer funds from BioChemics to VASO, and no one else at BioChemics was involved in the decision.  BioChemics continued to transfer funds to VASO even after VASO filed for bankruptcy in 2010, and VASO continued using the transferred funds to make purported salary payments to Masiz, totaling more than $22,000 after the bankruptcy.

**First Claim for Relief**
**(Violation of Section 17(a) of Securities Act By BioChemics, Masiz, Medoff and Kroning)**

97.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 96 above as if set forth fully herein.

98.     By engaging in the conduct described above, BioChemics, Masiz, Medoff and

Kroning have, directly or indirectly and singly or in concert, acting intentionally, knowingly or

recklessly, by use of the means or instruments of transportation or communication in interstate

commerce or by the use of the mails, in the offer or sale of securities:  (a) employed devices,

schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements

of material fact or omissions to state a material fact necessary to make the statements made not

misleading in light of the circumstances under which they were made; and/or (c) engaged in

transactions, acts, practices, or courses of business which operated or would have operated as a

fraud or deceit upon purchasers of securities.

99.     By engaging in the conduct described above, BioChemics, Masiz, Medoff and

Kroning have directly or indirectly and singly or in concert, violated, and unless enjoined will

continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**Second Claim for Relief**
**(Aiding and Abetting Violation of Section 17(a) of Securities Act By Medoff and Kroning)**

100.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 96 above as if set forth fully herein.

101.     By engaging in the conduct described above, BioChemics and Masiz, have,

directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, by

use of the means or instruments of transportation or communication in interstate commerce or by

the use of the mails, in the offer or sale of securities:  (a) employed devices, schemes, or artifices

to defraud; (b) obtained money or property by means of untrue statements of material fact or

omissions to state a material fact necessary to make the statements made not misleading in light

of the circumstances under which they were made; and/or (c) engaged in transactions, acts,

practices, or courses of business which operated or would have operated as a fraud or deceit

upon purchasers of securities.

102.    Medoff and Kroning each knowingly or recklessly provided substantial assistance

to BioChemics' and/or Masiz's violations of Section 17(a) of the Securities Act.

103.    By engaging in the conduct described above, Medoff and Kroning each aided and

abetted violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### Third Claim for Relief
**(Violation of Section 10(b) of Exchange Act and Rule 10b-5 By
BioChemics, Masiz, Medoff and Kroning)**

104.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 96 above as if set forth fully herein.

105.    By engaging in the conduct described above, BioChemics, Masiz, Medoff and

Kroning have, directly or indirectly and singly or in concert, acting intentionally, knowingly or

recklessly, in connection with the purchase or sale of securities, by use of the means or

instrumentalities of interstate commerce or the mail:  (a) employed devices, schemes, or artifices

to defraud; (b) made untrue statements of material fact or omitted to state material fact(s)

necessary to make statements made not misleading in light of the circumstances under which

they were made; and/or (c) engaged in transactions, acts, practices, or courses of business which

operated or would have operated as a fraud or deceit upon purchasers of securities and upon

other persons.

106.    By engaging in the conduct described above, BioChemics, Masiz, Medoff and

Kroning have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

**Fourth Claim for Relief**
**(Violation of Section 20(a) of Exchange Act By Masiz)**

107.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above as if set forth fully herein.

108.    By engaging in the conduct described above, BioChemics has, directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mail:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make statements made not misleading in light of the circumstances under which they were made; and/or (c) engaged in transactions, acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

109.    Masiz directly or indirectly controls BioChemics.

110.    Masiz did not act in good faith and directly or indirectly induced the acts or actions constituting BioChemics' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

111.    By engaging in the conduct described above, Masiz is jointly and severally liable with, and to the same extent as, BioChemics under Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)].

### Fifth Claim for Relief
### (Aiding and Abetting Violation of Section 10(b) of Exchange Act and
### Rule 10b-5 By Medoff and Kroning)

112.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above as if set forth fully herein.

113.    By engaging in the conduct described above, BioChemics and Masiz have, directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mail:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make statements made not misleading in light of the circumstances under which they were made; and/or (c) engaged in transactions, acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

114.    Medoff and Kroning each knowingly or recklessly provided substantial assistance to BioChemics' and/or Masiz's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

115.    By engaging in the conduct described above, Medoff and Kroning each aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### Sixth Claim for Relief
### (Violation of Section 15(a) of Exchange Act By Medoff and Kroning)

116.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above as if set forth fully herein.

117.    Medoff and Kroning, directly or indirectly, singly or in concert with others, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or

to induce or attempt to induce the purchase or sale of, securities, without being registered as a broker or dealer or associated with a registered broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

118.     As part of, and in furtherance of the violative conduct, Medoff and Kroning regularly promoted BioChemics securities to investors and advised investors about the merits of an investment in BioChemics.  Medoff and Kroning also received compensation directly or indirectly from BioChemics based on their successful promotion efforts that resulted in purchases or sales of BioChemics securities.

119.     By reason of the foregoing, Medoff and Kroning, acting directly or indirectly and singly or in concert with others, violated, and unless enjoined, will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

**Seventh Claim for Relief**
**(Violation of Section 15(b)(6)(B) of Exchange Act By Medoff )**

120.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above as if set forth fully herein.

121.     As described above, defendant Medoff, having been permanently barred by Commission Order from association with any broker, dealer, investment adviser, investment company or municipal securities dealer, without consent of the Commission willfully engaged in sales activity and profited directly or indirectly through commission payments in contravention of such order.

122.     By reason of the foregoing, Medoff directly violated and, unless enjoined, will continue to violate Section 15(b)(6)(B) of the Exchange Act [15 U.S.C. §78o(b)(6)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Find that each of the defendants committed the violations alleged in this Complaint;

B.      Enter a permanent injunction restraining each of the defendants and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from future violations of, and aiding and abetting future violations of, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

C.      Enter a permanent injunction restraining Medoff and Kroning and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from future violations of Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)] and, as to Medoff only, Section 15(b)(6)(B) of the Exchange Act [15 U.S.C. §78o(b)(6)(B)];

D.      Enter a permanent injunction restraining Masiz, and any entity he owns or controls, from directly or indirectly participating in the issuance, offer, or sale of any security, provided, however, that such an injunction shall not prevent Masiz from purchasing or selling securities solely for his own account;

E.      Order that Masiz be prohibited from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)];

F.      Enter a permanent injunction restraining Medoff, and any entity he owns or controls, from directly indirectly participating in the issuance, offer, or sale of any security, provided, however, that such an injunction shall not prevent Medoff from purchasing or selling securities solely for his own account;

G.      Require defendants to disgorge the ill-gotten gains they received as a result of their violation of the federal securities laws, plus pre-judgment interest thereon;

H.      Require defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

I.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

J.      Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

David London

_____
David H. London (Mass. Bar No. 638289)
Kathleen Burdette Shields (Mass. Bar No. 637438)
Joshua S. Grinspoon (Mass. Bar No. 645539)

33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8997 (London direct)
Facsimile:  (617) 573-4590
E-mail:  londond@sec.gov

Dated:  December 14, 2012